December 17.
JUDGE CARE
delivered his opinion.*
In 1813, David Wright made his Will, in which we find the following clause: “My will and desire is that my Executors hereafter appointed sell at public sale all my land, provided the said land wiii sell for as much, in their judgment, as wiil be equal to its value and the money arising from such sale be placed in the hands. of my friend *Stark’Armstead one of my Executors hereafter appointed, who I vest with power to apply the said money to any use or uses he in his discretion may.deem best for the benefit of my wife and all my children.” The Testator then adds, “In case the land should not be sold on account- of its not selling for its. value in the judgment” of those in whom he had vested the power to sell, iends a particular part of it to his wife for life. He appointed three Executors, of whom Stark Armstead was one. The Executors all refused to take upon themselves the execution of the Will. The wife relinquished all ben-' efit under it, and qualified as Administra-trix, with the Will- annexed. She died between three and four years after her qualification; and on the 9th of February, 1818, the same Stark Armstead, who had been appointed Executor, qualified as Administrator de bonis non, with the Will annexed, and three days afterwards, sold the land to Samuel Brown. The Deed, bearing date the 13th of February, 1818, contains a. full recital of all the facts on which the authority of the Administrator to sell the lan<t depended. The land was sold for $6,560, payable in three annual instal-ments, to be secured by bonds, with personal security, and also a Deed of Trust on the land. The contract was carried into complete execution by the vendee’s accepting the Deed, taking possession of the land, and sealing and delivering the Deed of Trust and Bonds. In 1823, five years-after the fexecution of the contract, the vendee paid $1.658 of the purchase money, and in April 1824, he filed his Bill, stating that Armstead had no power under the Will to sell the land ; that his title is therefore defective, and that he has a right to a Decree, either perfecting it, or if that cannot-be done, rescinding the contract, and giving, him back his money, with interest, which he nrays may be made a lien on the-land. He makes Armstead, the Trustee, and the four children of Wright, Defendants. Two of the children are adults, two-infants. Armstead and one of the adults. are non-residents, and have been. properly proceeded *against. The-Trustee, the other adult, and the infants (by their Guardian,) have answered. The children insist earnestly on the contract; that under the Will, the Law, and the decisions of this Court, the Administrator had full power to sell; that the sale was fair, all the facts being disclosed to *839 the vendee; that it was a very good sale for them, and that the Bill has grown out of the subsequent depreciation in the price of lands. The adult Defendant offers to give any security for the title that can be required. The Chancellor dismissed the Bill. We will enquire in the first place, could the Administrator execute the power of sale given by the Will to the Executors? In the 1st vol. R. C. 388, § 52, it is said, “The sale and conveyance of lands devised to be sold, shall be made by the Executors, or such of them as shall undertake the execution of the Will, if no other person be thereby appointed for that purpose, or if the person so appointed shall refuse to perform the trust, or die before he shall have completed it,” (thus stood the Law, as passed in 1785, 12th Slat. at Large, 150; in 1974, was added the rest of the clause, as it now stands in the Revisal of 1819, via:) “but if none of the Executors named in such Will shall qualify, or, after they have qualified, shall die before the sale and conveyance of such lands, then, in those cases, the sale and conveyance thereof shall be made by such person or persons to whom administration of the Testator’s estate, with the Will annexed, shall be granted.” This Law as passed in 1785, was taken from 21st H. 8, c. 4. It was admitted in the argument, that if the Testator had directed a positive and unconditional sale of the land by his Executors, the case would have come directly within the Law: but they are directed to sell “provided the land wUl sell for as much in their judgment as will be equal to its value;” and this, it is insisted, renders it a special confidence reposed in the individuals appointed Executors, which is personal to them; and can only be exercised by them, and not even by a part of them, hut by the whole *only. This point was argued with great strength, but the researches of the Counsel had enabled him to produce no cases in support ol it; nor have I found any. Without pretending to enter deeply into the doctrine of powers, I may observe that at Common Law they were of two kinds, a naked power, and a power coupled with an interest. Thus, if A. devise his land to his Executors, B., and C. and D., with directions to them to sell it. and hold the money for the benefit of E-, this is a power coupled with an interest, because the land being devised to the Executors, the legal estate passes to them. But if A. direct in his Will, that his Executors B., C. and D., sell his land, and hold the money for the benefit of E., this is a naked power, because no estate or interest passes to the Executors. In their construction oi these powers, the Courts of Common Law have said, that the first shall be taken liberally, the last strictly; that a naked power give, to Executors to sell land, can only be exercised by all the Executors; that, therefore, if one refuse to qualify, or to join in the sale, or die before a sale, no sale can take place. But if lands be devised to Executors to be sold, the power will survive, and such Executors as qualify, or remain alive, may execute the power. This was sacrificing reason and justice to narrow views of strict technical form, for nobody could fail to see, that in each case the intention of the Testator was to turn the land into money, and give that to E., and that iri each, equally, the Executors were merely instruments for effectuating such intention. On this ground, Courts of Equity, at an early day, took up the subject, and decided that such naked powers, though extinct at Law, should be enforced in Equity, “rightly deeming, (says Hargrave, in his Note on Coke Littleton, 113, a,) the purpose, for which the Testator directs the money arising from the sale to be applied, to be the substantial part of the devise, and the persons named to execute the power of selling, to be mere Trustees, which brings the case within the general rule oí equity; that a trust shall never “fail of execution for want of a Trustee, and that if one is wanting, the Court shall execute the office.” I apprehend, that the Stat. 2ist H. 8, c. 4, was intended to save parties from the delay and expense of resorting to Courts of Equity in such cases, by supplying a Trustee, and such also was the meaning of our Act; and as I think, such should be the spirit in which it is executed. When the question is, whether Equity will assist the executioti of a power, by supplying a Trustee, or otherwise, the important enquiry does not seem to be, whether the exercise of the power involves a personal confidence, (for most powers do that in a greater or less degree,) but whether it be a pure and simple power, or a power blended with a trust, In the first case, Equity never interposes; in the last, always. In Tollet v. Tollet, 2 P. Wms. 490, the Master of the Rolls says, “This Court will not help the non-execution of a power, since it is against the nature of a power, which is left to the free will and election of the party whether to execute or not, for which reason Equity will not say he shall execute it, or do that for him. which he does not think fit to do for himself.” Lord C. J. Wilmot says, (Wilm. 23, cited Sugd. on P >wers, 393,) “Powers are never imperative: they leave the act to be done at the will of the party to whom they are given. Trusts are always imperative, and are obligatory on the conscience of the party intrusted.” “But sometimes,” (says Sugden, in his Treatise on Powers, 393,) “trusts and powers are blended ; a man may be invested with a trust to be effected by the execution of a power given to him, which is in that case imperative; and if he refuse to execute it, or die without having executed it, Equity, on the general rule that the trust is the land, will carry the trust into execution. This is the case where a power is given by a Will to Trustees to sell an estate, and apply the money upon trusts. The power is in the nature of a trust.” In Harding v. Glyn, 1 Atk. 469, Harding devised certain articles to his wife, “but did desire her at or before her death, to give the same unto and amongst *such of his own relations, as she should think most deserving and approve of.” Here we see a personal confidence of a very particular kind reposed in the wife. She was to select of his own relations as she *840 thought most worthy. Yet the Master of the Rolls held this to be a trust for the relations, in default of appointment. He said that it operated as a trust in the wife, by way of power of naming and apportioning, and her non-performance of the power should not make the devise void, but the power would devolve on the Court. And this decision is cited by Lord Eldon, as sound Law, in Brown v. Higgs, 8 Ves. 574. In Franklin v. Osgood, 14 Johns. Rep. 554, it is said by Judge, with whom a large majority of the Court agreed, “where a power is coupled with a trust to be executed for the benefit of others, although the power be given in the plural number, and a single Executor does not satisfy the literal expression of the Will, yet the power survives, and a conveyance made in execution of it, is valid.”
Let us see how the principle of these cases applies to the case before us. The Testator directs that his Executors shall sell at public sale all his land, provided it will sell for as much, in their judgment, as will be equal to its value, and the money to be placed in the hands of Armstead, one of the Executors, to be applied by him to such use as in his discretion he shall deem most for the benefit of his wife and all his children. What was the chief, indeed the sole purpose, of the Testator? The conversion of his land into money for the benefit of. his family. The Executors were the mere instruments for effecting this purpose. Nor do I think that any peculiar personal confidence is reposed in them. They are to sell, if the land will bring what in their judgment is equal to its value. But this, so far from an enlargement, is a restriction of their power. If he had said they should sell the land, without more, they might have sacrificed it. He meant to prevent this, and therefore restrained their power to . a sale for a fair price. By appealing to their judgment, as to the value *of the land, it cannot be supposed that he meant to submit it to their arbitrary will, and that they might so exercise that will, as to defeat the whole purpose of the power given them. No 1 .they were bound to exercise a sound discretion in the matter, bound to use all proper means to effect a sale; bound to take an advantageous offer for the land, if made to them : they were Trustees to this purpose for the beneficiaries, the wife and children, and if they neglected or abused their trust, a Court of Equity would interpose. Suppose they had been about to sell the land for half its value, would not Equity, on a Bill filed by the wife and children, have restrained them? Suppose double the value had been offered, and they had refused to sell, would not Equity have compelled a sale? I can have no doubt of it. The Executors then, were mere Trustees empowered to sell upon the trusts declared in the Will. Their power was limited in one respect, but within that limit the trust was equally as imperative, as if no such limit had been imposed. The case, therefore, seems to fall directly within the principle of those I have cited, and is clearly, I think, within the letter and the spirit of our Law; for, it is a case where land was devised to be sold by Executors, and they refusing, administration with the Will annexed was granted, and the Administrator has sold and conveyed the land. It was contended in the argument, that the renunciation of the wife defeated the purpose of the trust, and thereby destroyed the power of sale: but, I cannot assent to this. The Testator knew that the wife could, if she please, renounce the Will, but he did not make the power of sale dependent on that. It is to be seen throughout the Will, that the children were the chief objects of the Testator’s bounty; for, the provision made for the wife (except a trifle) is by way of loan for her life, while every thing is given to the children. Would it not be strange, then, if the wife, by any movement of her’s could destroy a power given principally for the benefit of the children? By renouncing the Will, she placed herself *upon her legal rights; one of these was a third of the land for life. This might possibly suspend the execution of the power of sale, by preventing the Executors from selling the land for its value, while encumbered with her dower, but it could have no further operation, and we know, that the sale here, was made after her death, and for a full price.
But, another and very conclusive objection to this Bill is, that it seeks to rescind an executed contract, where there has been neither fraud, concealment, nor mistake in fact. The exhibit annexed to the Bill, show that every fact in the case was fully explained and understood, and the sole ground on which a recission is asked, is ignorance of Law, a conclusion from the facts that the Administrator had a right to sell. I think I have shown that this conclusion was correct; but, suppose it otherwise, that it was founded on a mistake of the Law. “Ignorance of the Law excuses no man,” This is among our oldest maxims, and applies even to criminal cases of the highest grade. In truth, it lies at the very foundation of all Law; for, if we suffer the plea of ignorance to excuse a man from the legal consequences of his acts or agreements, that plea must rest wholly on his own assertion, the truth of which, no other evidence could be adduced either to prove or disprove. In executed contracts, it is the general rule that fraud must be charged and proved to authorise a recission. Mistake of fact, wheré it is plain, palpable, and affects the very substance of the subject matter of the contract, is sometimes a ground for recission, but a simple mistake of Law, I think, never. There are certainly some of the elder cases which have given relief, in a few instances, of very gross mistake of Law, and two of them are cited in my remarks on the case of Thompson v. Jackson, 3 Rand. 504; but, the great weight of authority, indeed I believe I might say, all the late cases are to the contrary. For these cases, I refer to the case just mentioned, and also to *Pate v. M’Clure, 4 Rand. 164, and Commonwealth v. M’Clanachan’s Ex’ors. Id. 482.
There was another subject touched in the argument, on which I will not now give a decided opinion, but my present impres *841 sions. The question is, whether a dismission of the Plaintiff's Bill would not so far bind the infants, as to preclude them ¡hereafter from impeaching1 the title of the Plaintiff. I incline to think it would. I know very well that the general rule is, that an infant Defendant is not bound by a Decree, if when he arrives at age he can show error in it; and to enable-him to do this, he has a day given him, which is generally six months after he comes of age. But, an infant Plaintiff is as much bound by a Decree as an adult. Even an infant Defendant may be bound by a Decree, if made for his benefit. For instance, where a Bill is brought against an infant heir of a mortgagor, the usual course in England (till lately) was to decree a •foreclosure, and give the infant a day after his age, (not that he would then be entitled to unravel the accounts, or to redeem the mortgage, but merely to show error in the Decree.) But if, instead of a foreclosure, it was found most for the benefit of the infant to Decree a sale, this might be done by the Court, and such Decree and sale would bind the infant. Booth v. Rich, 1 Vern. 295. So, if lands devised to be sold for payment of debts are Decreed to be sold, the infant has no day after he comes of age, unless he be Decreed to join in the sale. 2 Vern. 429. In Goodier v. Ashton, 18 Ves. 83, there was a Bill to foreclose against an infant heir of a mortgagor, Counsel for the Plaintiff, proposed, instead of a foreclosure, to take a Decree for a sale, as most advantageous for the infant, as was Decreed in the case of Booth v. Rich. Counsel for the Defendant, admitted that a sale would be most beneficial to the infant, and suggested a reference to a Master, to report whether it would not be for the advantage of the infant to have a sale. The Master of the Rolls said, the modern practice had been to foreclose, and unless he could find the case in Vernon had *been followed since, he would not make the precedent, though he seemed to entertain no doubt of the power of the Court to bind the infant by a sale in such case. In Mondey v. Mondey, 1 Ves. & Beame, 223, the same question came before Lord Eldon. The Counsel prayed a sale, observing that though • they could not produce an instance, this might perhaps be done; as the Court had in many respects extended its jurisdiction for the benefit of infants. The Chancellor said, “It would be too much to let an infant be foreclosed; when, if the mortgagee will consent to a sale, a surplus may be got, of perhaps 4,0001. considered as real estate, for the benefit of the infant. If there was no precedent, I would make one: but I am sure this has been done.” See also Mills v. Dennis, 3 Johns. Ch. Rep. 368. From these cases, it seems not doubted, that a Court of Equity, acting for the benefit of the infant, may bind his rights absolutely by their Decree, though he be a Defendant. And if such doctrine be sound in any case, it would seem to apply very strongly to the case before us. Here, the land was devised tu be sold for the benefit of the children, it was sold, and, as the whole case shows, most advantageously sold. The vendee asks to rescind the contract, because he has not, and cannot get a good title. The children, adults and infants, protest against setting the sale aside, asserting that the title is perfect in the vendee. If these children were all of age, there can be no doubt that their Answers and the Decree of the Court, would bind them. It is the privilege of infants, given for their safety and protection, not to be bound generally in such cases, and the Court as their Guardian, is to take care of them; but, to enforce this privilege in the present case, and say, that because the Court cannot bind infants, this contract shall be rescinded, would be to use their shield as a sword to pierce them; for, if the contract be rescinded, the money paid must be returned and made a lien on the land, and I have little doubt, that for the $1,658, which the vendee has paid, he would, on a sale of the land, be *enabled to buy it in ; thus ruining the infants under the privilege given for their protection. In such a case it would seem strange, if a Decree at their instance and for their benefit, would not bind them. Suppose, that instead of a Deed of Trust, the vendee had given a Mortgage on the land, and the infants had come in as Plaintiffs to foreclose, asserting the validity of the sale, the goodness of the vendee’s title, and praying a Decree for the sale of the land unless the money were paid in a given time; being Plaintiffs, there can be no doubt that a Decree in such a case would bind them, and prevent their ever after impeaching the title of the vendee. But do they not in truth and reason, occupy precisely the same ground here? Having a Deed of Trust, they could proceed in the country to a sale, they have not therefore filed a Bill, but when called into Court to prevent their selling under the Deed, and to rescind the contract, they affirm the contract with all their might, they take their stand upon it, and pray the benefit of it, just as they would have done on a Bill to foreclose a mortgage. From these views, I am strongly inclined to think, that these infants will be so far bound by this Decree, as to be precluded from ever impeaching the Plaintiff’s title. Upon every ground, I am for affirming the Decree.
The PRESIDENT, and JUDGES CA-BELL and COALTBR, concurred, and the Decree was affirmed.

Absent, Judge Gbeen.